36953. THE STATE v. REID.

HILL, Presiding Justice.

On the morning of August 14, 1978, an agent of the U. S. Department of Justice, Drug Enforcement Administration, stood at Gates 41 and 42 at the Atlanta International Airport watching passengers disembark from a commercial flight from Fort Lauderdale, Florida, at about 5 a.m. The agent held a bachelor of science degree in criminology and law enforcement from FSU and had been with DEA (or its predecessor agency) approximately six years — four years as an investigator and two as an agent. He routinely watched flights from south Florida (Miami and Fort Lauderdale) because large amounts of heroin coming into the United States are distributed from there. Although he was familiar with the so-called drug courier profile, he did not follow it to the letter. Rather he looked for some characteristics that are included in the profile as well as others that are not, and he let his own experience be his major guide.

According to the agent, 50 to 75 people disembarked from the flight, including the defendant, Tommy Reid, Jr. Reid was carrying a "rather large, light colored, man's purse"; another man (Claude Williams) with a nearly identical purse disembarked eight to ten

people behind Reid. Neither Reid nor Williams asked for directions from the airline's flight attendant, indicating to the agent that they had no connecting flight to catch. The gates involved were on a level lower than the main concourse; as was his custom, the agent watched the disembarking passengers walk up the steps. He noticed Reid kept glancing over his shoulder at Williams, who was 10 to 15 feet behind him. Surmising that Reid and Williams were travelling together but trying to conceal it, the agent became suspicious and followed them. From the top of the stairs they proceeded 75 to 100 yards to the center terminal security checkpoint. Williams stayed 10 to 15 feet behind Reid, and Reid turned to check Williams' position four or five times. Once they had passed through the exit beside the checkpoint, Williams caught up with Reid and spoke a few words to him. Both men then quickened their pace and "hurriedly walked" toward the front doors of the terminal, bypassing the escalators leading down to the baggage claim area.

Just as they left the terminal and were on the front sidewalk getting ready to cross the traffic lanes in front of the terminal, the agent approached them and said excuse me (or something similar) to attract their attention.[1] The agent was dressed in blue jeans and a lightweight jacket (a windbreaker); his gun was in the right rear area of his belt, stuck in his waistband, completely hidden by his jacket. Having gotten Reid and Williams' attention, the agent identified himself as a DEA agent and showed them his identification. The agent then asked Reid and Williams if they would show him their airline tickets, which they did. The tickets had both been paid for by a credit card in Reid's name; except that one was issued to T. Reid and one to C. Williams they were identical. They were round trip tickets, departing Atlanta and arriving in Ft. Lauderdale at about 2 a.m., August 13, and on return arriving in Atlanta at about 5 a.m., August 14. There were no baggage claim stubs on the tickets. The agent then asked Reid and Williams for identification; Reid produced a Visa card and Williams a Georgia driver's license. The agent observed that Reid appeared to be nervous as his fingers were trembling. The agent then asked if they would mind telling him what the purpose of their trip to Ft. Lauderdale was. Williams responded that they had gone to see friends.

---

[1] The transcript of the hearing on the motion to suppress indicates that instead of simply saying excuse me, the agent also tapped one of the men on the shoulder to get their attention. During cross examination he was asked if he had testified at the preliminary hearing that he had tapped one of them on the shoulder. He stated that he did not recall having so testified but he did not deny having so testified. On redirect examination he was asked, "Did you have a weapon or grab these men?" and

The agent then testified: "At that time, I told both gentlemen that from drug information we were seeing awfully lot [sic] of drugs being carried through the airport. And I asked them if they would cooperate with me to eliminate suspicions that I have about them, about accompanying me back to the airport and allowing me to conduct a quick pat-down search of their person and to look in their purses." According to the agent, Williams answered "Yeah, okay" and Reid nodded in the affirmative. The agent then turned to walk back into the terminal, the front doors of which were 6 to 8 feet away or slightly further. Reid walked back into the terminal but Williams hesitated on the curb. The agent waited for Williams. Reid proceeded into the terminal, turned to the left, and began running. The agent gave chase after turning Williams over to a passing Atlanta police officer. Reid was caught in the parking lot; by then the agent was holding his gun; Reid threw up his hands and stopped. The agent handcuffed Reid and took him to the Atlanta police airport office. Having returned to where he had left Williams in custody and asked that police officer to take him to the office, the agent then retraced Reid's steps and retrieved the purse which Reid had discarded from the foyer through which Reid had exited the airport. The purse was about 100 feet from where the agent apprehended Reid.

When the agent returned to the police office, the officer guarding Reid told him she had seen Reid drop something into a trash can. Reid was alone in a room; the trash can was 2 or 3 feet from where he sat.[2] Upon investigating, the agent found that the trash can had been recently emptied; the only item in the can, except for the plastic bag liner, was a small silver key. The agent used the key to open the purse; inside he found $1,036 in small bills, some change, and a Johnson Baby Powder container. He pried the top off the container and inside found a clear plastic bag in which was another clear plastic bag containing a white powder substance he tentatively identified as cocaine.

Reid was indicted for a violation of the Georgia Controlled Substances Act, to wit, possession of cocaine; subsequently his attorney filed a motion to suppress the evidence against him which

---

he answered, "No way did I touch them." Finally, during recross examination the defendant tendered a copy of the preliminary hearing transcript to show that on cross examination, when asked, "How did you go about stopping them?" the agent answered, "I just tapped one of them on the shoulder." The state conceded that that statement was made.

[2] The officer guarding Reid was in the next room, but had been observing him through the open door.

was seized at the Atlanta Airport, on the ground that the evidence was seized as the result of an illegal arrest, and "the officer [could] show no articulable suspicion to justify the intrusion upon the rights of the defendant to be free from unreasonable searches and seizures." At the hearing at which the DEA agent was the only witness, the trial court found that "at the time the officer suggested these men go back into the airport with him" they were under arrest, and that at that point the officer had no "articulable suspicion." The trial court therefore granted the motion to suppress.

On appeal, the Court of Appeals reversed, finding that the defendant and Williams fit the DEA drug courier profile in a number of respects and holding that the evidence was sufficient to establish "articulable suspicion" sufficient to justify a brief stop for questioning under Terry v. Ohio, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968); that the evidence that Reid voluntarily consented to return to the terminal was unrebutted and thus he was not under arrest prior to his flight; and that "Given a permissible 'Terry stop' and a freely given consent to return to the terminal for 'the pat-down and look in the purse,' there is ample authority for the proposition that flight in connection with the other circumstances would provide probable cause for the subsequent apprehension and search of the purse discarded in defendant's flight." Reid v. State, 149 Ga. App. 685, 687 (255 SE2d 71) (1979).

After this court denied certiorari, the United States Supreme Court granted certiorari, vacated the Court of Appeals opinion, and remanded the case to the Court of Appeals for further proceedings. Reid v. Georgia, —— U. S. —— (100 SC ——, 65 LE2d 890) (1980). The U. S. Supreme Court held that the evidence did not, as a matter of law, show a basis for an articulable or reasonable suspicion sufficient to justify any seizure of Reid, even a "Terry stop." Thus the Court held that the Court of Appeals judgment "cannot be sustained insofar as it rests on the determination that the DEA agent lawfully *seized* the petitioner when he approached him outside the airline terminal." (Emphasis supplied.) Justice Rehnquist dissented for the reasons stated by Justice Stewart in his opinion in United States v. Mendenhall, 446 U. S. 544 (100 SC ——, 64 LE2d 497) (1980); Justice Powell, joined by Chief Justice Burger and Justice Blackmun, concurred, pointing out that the facts are remarkably similar to those in Mendenhall, supra, and that the issue of whether Reid was "seized" when he was stopped for routine questioning remained open for consideration.

On remand, the Court of Appeals affirmed the trial court's order sustaining the defendant's motion to suppress without comment as to the question of whether there was a seizure in this case as described in

Mendenhall. *State v. Reid,* 156 Ga. App. 78 (274 SE2d 164) (1980). We granted certiorari to determine whether the Court of Appeals erred in affirming the trial court's granting of the motion to suppress. Compare *McShan v. State,* 155 Ga. App. 518 (271 SE2d 659) (1980).

The Fourth Amendment provides in pertinent part that "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated. . . ." Yet ". . . not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U. S. 1, supra, at p. 19, fn. 16.[3]

The first question that must be resolved in this case is whether the DEA agent's approach to and interview with the defendant, in which he asked him for identification, to see his airline ticket, why he had been to Ft. Lauderdale, and whether he would return to the terminal and consent to be searched, constituted a seizure of his person. For if it does, the trial court must be affirmed since the United States Supreme Court has held that the agent had no articulable or reasonable suspicion sufficient to justify a seizure. Reid v. Georgia, supra.

We find that during this initial encounter there was no seizure. "[A] person is 'seized' only when by means of physical force or a show of authority, his freedom of movement is restrained." United States v. Mendenhall, supra, 446 U. S. at 553 (opinion by Justice Stewart, joined by Justice Rehnquist). Justice Stewart concluded that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.[4] Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an

---

[3] The fact that the defendant was walking (as opposed to being seated in the terminal) and his egress was interrupted by the agent appears to have no legal significance. Compare United States v. Berd, 634 F2d 979, 982 (5th Cir. 1981), with United States v. Berry, 636, F2d 1075, 1077 (5th Cir. 1981). The defendant in United States v. Mendenhall, supra, was walking when her progress was interrupted by the agent.

[4] (Footnote added.) This statement was quoted by Justice Powell in his concurring opinion, joined by the Chief Justice and Justice Blackmun, in Reid v. Georgia, supra, in which he stated that the seizure issue remains open for consideration by the state courts. Justice White in his dissenting opinion, joined by Justices Brennan, Marshall and Stevens, in United States v. Mendenhall, supra, was also of the view that the seizure issue was not properly before the Court.

officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Id. at 554.

Considering these factors here, there were two citizens and only one DEA agent, they were standing just outside an airline terminal, the agent's weapon was not visible to the defendant or his companion, and the agent "suggested these men go back into the airport" (finding by the trial court, quoted above) and requested their consent to a search. Assuming the agent did tap the defendant on the shoulder at the outset to get his attention (see fn. 1, supra), he simultaneously said excuse me or something similar; in view of all the circumstances this physical contact alone does not constitute a seizure such that a reasonable person would believe he was not free to leave.[5] On this evidence, we find (paraphrasing United States v. Mendenhall, 446 U. S. at 555) nothing in the record to suggest that the defendant had any objective reason to believe that he was not free to end the conversation and proceed on his way and for that reason we conclude that the agent's initial approach to him was not a seizure.[6] It was error to find that the defendant was under arrest at the time the agent suggested he go back into the terminal. We therefore reverse the affirmance of the order granting the motion to suppress which order was based on the conclusion that Reid had been arrested before he fled.

*Judgment reversed and remanded for further proceedings not inconsistent with this opinion. All the Justices concur, except Smith, J., disqualified.*

DECIDED APRIL 9, 1981.

Lewis R. Slaton, District Attorney, Benjamin H. Oehlert III, *Assistant District Attorney*, for appellant.
*Dennis S. Mackin*, for appellee.

---

[5] See United States v. Robinson, 625 F2d 1211, 1216 (5th Cir. 1980), where the discrepancy between the agent's testimony and that of the defendant that the agent touched the defendant on the arm was not considered material. In the case before us the agent indicated verbally that he was suspicious about the defendant but the request that they consent to be searched showed that he had such suspicions in any event.

[6] See United States v. Berry, 636 F2d 1075, 1079 (5th Cir. 1981).